COLHOUN for the use of ZANK *against* SNIDER.

IN ERROR.

1813.

*Chambersburg,
Monday,
October 4.*

IN this case, which was *assumpsit* in the Common Pleas of *Franklin* county against *Snider* as sheriff, to recover the proceeds of sale of a house and lot taken in execution at the suit of the plaintiff against *Michael Immel*, the following statement of facts was submitted for the opinion of that Court, and was the basis of the argument in this.

A judgment is not a lien upon lands subsequently purchased by the defendant, and aliened before execution issued.

" *Samuel Colhoun*, having obtained a judgment in the Com-
" mon Pleas of *Franklin* county, by confession of *M. Immel*,
" on the —— day of —— 1804, a *scire facias* issued on said
" judgment to *April* 1807, for the use of *Jacob Zank* against
" *Michael Immel*, and terre-tenant, and was served on the
" terre-tenant. On the 28th of *April* 1807 judgment was en-
" tered on the *scire facias*, and execution issued to *August*
" Term 1807. A levy was made on a house and part of a
" lot of ground in the borough of *Chambersburg*, and a ven-
" *ditioni* issued to *January* Term 1808. It is agreed that
" the amount of sale will more than satisfy the said judg-
" ment; that the said house and lot were acquired by the
" said *Michael* after the judgment obtained by the said *Zank*
" [*Colhoun*] first as aforesaid, but before the issuing of the
" *scire facias* and judgment thereon: that the said *Michael*
" *Immel* on the —— day of *May* 1806, obtained the benefit
" of the Insolvent Laws of the State of *Pennsylvania*, and
" assigned his property of every description [the premises
" *inter alia*] in trust for his creditors. If on the above state-
" ment, the Court should be of opinion that the said judg-
" ment, so first had as above, was a lien on the said house
" and lot acquired as above, then judgment to be entered
" for the plaintiff; but if the Court should be of opinion that
" the said judgment was not a lien, then judgment to be en-
" tered for the defendant."

Judgment was entered below for the defendant, and the plaintiff sued out this writ of error.

The point was argued with great learning at the last term of this District, by *M'Cullough* and *Duncan* for the plaintiff in error, and by *Chambers* and *Dunlop* contra; and was held

under advisement until this term. The arguments of the counsel being, so far as is material, detailed in the opinions of the judges, it is only necessary to advert to the authorities that were cited and relied upon.

In favour of the position that a judgment is a lien upon after purchased lands, were cited 1 *Roll. Abr.* 892. *No.* 14., 30 *Ed.* 3. 24., 1 *Roll. Ab.* 892. *No.* 15. *No.* 16., 30 *Ed.* 3. 24., 2 *Roll. Abr.* 472. *P. No.* 3., 2 *H.* 4. 8 *b.*, *Brace* v. *Duchess of Marlborough* (a)., 2 *Saund.* 68 e. note., *Sugden's Law of Vendors* 306., 42 *Ed.* 3. 11. a., 42 *Ass. pl.* 17., 2 *H.* 4. 8. a. pl. 42. 14. a. pl. 5., *Sheph. Pract. Couns.* 305., *Hickford* v. *Martin* (b)., 19 *Vin.* 555. 560., *Fitz. N. B.* Ld. *Hale's Notes,* 596., 6 *Com. Dig. Statute Staple.* D. 5. pa. 305., 2 *Saund.* 8. 9. 10. note 5., 2 *Bac.* 698. *Execution.* B. 5., *Ib.* 700., *Co. Litt.* 102. a., 1 *Smith's Laws,* 57. 60.

On the other hand were cited 2 *Bac.* 686. *Execution A.,* *Co. Litt.* 102 a. b., 2 *Inst.* 395. 396, 678., 3 *Rep.* 12 a., *Terms de la Ley. Execution.,* 3 *Black.* 419., *Rundle* v. *Etwein,* (c), *Pleasants* v. *Boyer,* (d.)

(a) 2 *P. Wms.* 492.             (c) *M. S. Sup. C. Pa. Dec.* 1795.*
(b) *Winch.* 84.                 (d) *M. S. Ct. Ct. Westmd.* 1802.

* The following is a note of that case, extracted by the Chief Justice from the manuscript notes of Mr. Justice *Yeates.*

RUNDLE and MURGATROYD ⎫ Supreme Court, *Philadelphia, December* Term
        *v.*            ⎬ 1795, before *M'Kean* C. J., *Shippen, Yeates,* and
    ETWEIN.             ⎭ *Smith,* Justices.

*Scire facias* on a judgment for plaintiffs as assignees of *John Schaffer* against *George Weiss,* 26th *February* 1787, on a bond dated 14th *January* 1786. A *fi. fa.* issued to *June* term 1789, which was levied on real property acquired by *Weiss* subsequent to the judgment, and aliened by him prior to the levy. By agreement of the parties, the defendant was permitted to inquire into the consideration of the bond on which judgment was obtained; and it was clearly proved that the bond was obtained from *Weiss* without consideration, and by a wicked and fraudulent combination to defraud *Charles Norris* (a young man of large fortune but subject to intemperance) of a considerable sum of money; and that the bond formed part of the system of the iniquitous proceeding.

The Court declared that the plaintiffs, though innocent assignees of the bond, and without notice, stood in the place of the obligee, so as to let in every defence, which the obligor had against the obligee at the time of the assignment or notice thereof, and therefore were not entitled to recover on the merits either in law or equity.

They further declared that execution could not be levied on lands, which the defendant got by purchase after the judgment, if he aliened them before execution *bona fide.* Verdict for defendant. *Rawle* for plaintiffs. *Porter* and *Lewis* for defendant.

TILGHMAN C. J. The question in this case is, whether a judgment is a lien on lands purchased by the defendant after the judgment, and aliened before execution issued. I am well satisfied that by the *English* common law such lands are bound. But it seems to have been differently understood in this state. In the case of *Rundle* and *Murgatroyd* v. *Etwein*, in this Court, (*December* Term 1795) it was the opinion of all the Court, as appears by a manuscript note of Judge *Yeates*, that after purchased land was not bound. I feel myself obliged to pay great respect to this opinion, particularly as the late Chief Justices *M'Kean* and *Shippen* were then on the bench, who from their age and long experience were well acquainted with the practice of early times. It is certain that in many instances the common law of *England* has been departed from in this country, from a sense of inconvenience, which has produced a *silent practice*, not now to be traced to its origin. In truth it is of no great importance how the point is settled, so that it be but settled; and I am induced to abide by the decision in *Rundle* v. *Etwein*, because I perceive that it has been acted upon in different parts of the state, so that to overturn it now might be injurious to purchasers who have relied upon its authority. I find by notes of the late Judge *Smith*, in my possession, that the law was laid down in conformity to *Rundle* v. *Etwein*, in the case of the *Canal Company* v. *Nicholson* in this Court, (*March* Term 1798,) and in *Pleasants* v. *Boyer*, Circuit Court, *Westmoreland* county, *November* 1802. There has been some difference of opinion respecting the common law on this point; but I have reason to suppose from a conversation which I once had with Judge *Smith*, that both he and Chief Justice *Shippen* founded themselves on the understanding which had long prevailed in this state. Be that as it may, my opinion is bottomed *solely* on the decisions which I have mentioned, and therefore I forbear from entering into any discussion of the common law principle.

I am of opinion that the judgment should be affirmed.

YEATES J. The question before the Court is, whether lands purchased by a defendant after judgment had against him, and sold by him *bonâ fide* before execution, be bound

VOL. VI.                    S

*Margin:*

1813.

COLHOUN
*v.*
SNIDER.

1813.

COLHOUN
v.
SNIDER.

by the lien of the judgment, so that the same may be taken in execution, in the hands of the fair purchaser.

This subject has presented itself to my consideration, both at the bar and on the bench, and I have given it all the reflection in my power. I shall now consider it upon principle, upon the *English* authorities, and how far such lien would be consistent with our laws and customs.

Upon *principle*, it seems to me that whatsoever may be the efficacy of a judgment *per se*, it must take place at the time the same is rendered. The lien attaches at the moment of entry, and I can have no idea of its shutting at one period and opening at another, so as to embrace, *of itself merely*, property not originally bound. Its effects are immediate, and must be known and ascertained, when the judgment is given, and cannot depend upon subsequent events, unless it has been so provided by positive law. In a writ of debt, a man shall not have recovery of any lands but of those which the defendant hath the day of the judgment yielded; and of chattels, a man shall have execution only of the chattels which he hath the day of the execution issued. *Termes de la Ley, Voc. Execution.*

In point of *authority*, I fully agree that several of the elementary writers lay down the law, that execution may be sued of any land which the defendant had by purchase after the judgment, though he had *aliened it* before execution. 1 *Rol. Abr.* 892. *pl.* 16.; 10 *Vin. Abr.* 563. *pl.* 16.; 3 *Danv. Abr.* 317. *pl.* 16.; *Sugden's Vendors* 306. The position in the first three writers rests on the *single* authority of the *Year Book* of 30 *Edw.* 3. 24. The note subjoined to *Sugden* has enumerated some other cases, none of which upon inspection will be found to warrant the doctrine in the extent laid down. *Rolle* seems to have been followed by the other authors, but how far he is himself supported by the authority he relied on, must be collected from 30 *Edw.* 3. 24., a literal translation whereof follows: " A man had recovered " a certain debt against Sir *John de Moleyns*, and had an " *elegit.* The sheriff returned that he had nothing. *Mowb.(a)* " prayed the *capias. Fish.(b)* When you have execution at

(a) *John de Mowbray, a Serjeant at Law. Dugd. Chron. Seri.* 47.
(b) *Will. de Fishide, Serjeant at Law. Dugd. Chron. Ser.* 49.

" your election, and you choose the *elegit*, you cannot now
" have another execution. *Mowb.* After *fieri facias*, if the
" sheriff returns that he has nothing, a man shall have
" *elegit. Seton* (a). Every *elegit* includes a *fieri facias.*
" *Finch.* If at the time of the judgment rendered, he had
" any land, but had aliened afterwards, you might have
" execution of this; and if he had purchased lands after-
" wards, you have execution of this, for you have the
" *elegit, sicut alias et pluries;* and if he had no lands at the
" time of the judgment rendered, this would be your own
" folly that you would pray an *elegit*, and then when you
" were apprized that he had nothing; therefore there is no
" mischief, but you shall not have the *capias* &c."

Now it appears to me that this case not only does not sup-
port the inference of the abridgers, but is directly opposed
thereto; because the *Year Book* says, if at the *time of the judg-
ment* rendered, the defendant had lands, but had *aliened after-
wards, of this* you may have execution. If he had purchased
lands afterwards, of this you may have execution by *alias*
or *pluries elegit.* It cannot be denied that one may fairly
sell his lands, pending a writ sued out against him, before
judgment; but that he cannot defeat a judgment by a sale
of the lands of which he was seized when the judgment
was given. As to after purchased lands, the previous judg-
ment in my idea does not affect them, but they are bound
by the delivery of the writ to the sheriff.

Sir *Nicholas Statham* (b) first attempted to methodize
the law. It has been remarked that this venerable abridg-
ment contains many original authorities, which are not ex-
tant at large in the *Year Books.* It is difficult to make out his
law *French* from the frequency of his abreviations; but the
following is supposed to be a correct translation of the case
reported by him, title *Execution*, page 1.

" *Mich.* 30 *Edw.* 3, one prayed execution by *elegit*, and
" had it, to which the sheriff returned that he had nothing;
" wherefore he prayed a *capias*, and he could not have it.
" But it was said to him that he might sue *sicut alias*, if the
" tenant came to the *lands or goods* afterwards, but he shall

(a) *Seton, a judge of B. R. Ib.* 46. *and appointed Chief Justice,* 31 *Edw.* 3.
*Ibid.* 48.
(b) *He was appointed second Baron of the Exchequer. Dugd. Chron. Ser.* 68.

1813.
COLHOUN
v.
SNIDER.

"never have *capias*, nor *fieri facias*. And *Thorpe* (a) said "that the reason is, because the entry is that such a "one comes and *elegit* his execution of the moiety &c. "which is the plaintiff's high execution &c." *Fitzherbert* in his *Grand Abridgment, tit. Execution,* 126, is almost a literal copy of it, and has assisted me in my translation. It is obvious on comparison that *Statham* and *Fitzherbert* did not abridge this case from the *Year Book;* and that they put the after purchased lands and goods upon the same footing, as to the effect of the *alias elegit.* Respectable as the name of *Rolle* may be, I cannot avoid observing, that when he cites an authority for his doctrine, we are bound to examine the accuracy of his extract.

The plaintiff's counsel have urged another argument from the usual form of writs of *elegit*, which directs the sheriff to deliver one half of the defendant's lands which he had at the time of the judgment given, *or ever after,* (or *at any time since*) upon a reasonable price or extent. At common law, lands could not be taken in execution on a judgment for debt or damages, unless in special cases. The *Stat. of Westm.* 2. *c.* 18. (13 *Edw.* 1,) was the first act which subjected lands to the execution of a judgment or a recognizance. 3 *Co.* 11 *b.* 12 *a., Wright's Tenures* 170, 171. The statute directs that " *Cum debitum fuerit recupe-* " *ratum, quod vicecomes liberet ei medietatem terræ suæ,* " *quousque debitum fuerit levatum per rationabile pretium* " *vel extentam, et si ejiciatur de illo tenemento, habeat re-* " *cuperare per breve novæ disseisinæ, et postea per breve* " *redisseisinæ si necesse fuerit.*" 1 *Ruff. Stat.* 93. *Ld. Coke in his* 7 *Rep.* 39 *a,* states that by construction of law the *medietatem terræ* is of all the lands which the debtor had at the time of the judgment given, or *at any time after.* If either he or the writ had gone further, and said "though "the lands after acquired, had been sold by the debtor sub- "sequent to the judgment," I should have thought the argument conclusive as to the law of England; but as I have before asserted, I understand the law to be, that the after purchased lands of which the debtor stood seized at the time of the delivery of the *elegit* to the sheriff, became thereby

(a) *Will. de Thorpe was appointed Chief Justice of B. R.* 20 *Edw.* 3.

subject to the debt, in the same manner that all his personal property would then become. *Lord Coke* too, in his 2 *Inst.* 395, commenting on the words *medietatem terræ suæ* in the statute, lays it down expressly "this is to be understood of "such lands as the defendant had *at the time of the judgment* "*given*, or of the recognizance knowledged, unless it be con- "veyed away by fraud and covin to deceive his creditors." So in *Co. Litt.* 102 *a.* upon judgment in debt, the plaintiff shall not have execution but only of that land which the defendant had *at the time of the judgment,* for that the action was brought in respect of the person, and not of the land. And again in 7 *Co.* 171 *a.* the freehold and inheritance which a common person has *at the time of judgment,* is bound thereby, but in the king's case from the time the party becomes the king's debtor. It has been objected by the plaintiff's counsel, that these different passages in *Lord Coke's* works, mean nothing further than that lands sold *bona fide pending the writ,* are not bound by the judgment, but that his intention did not extend to after purchased lands. I cannot accede hereto, thinking as I do, that it would be using an unwarrantable freedom with plain language.

Sir *W. Blackstone* likewise, in his 3 *Comm.* 418. 419., speaking of the *stat.* of 13 *Ed.* 1. *c.* 18, says, if the goods are not sufficient to pay the debt, then the moiety or one half of the defendant's lands which he had *at the time of the judgment given,* is also to be delivered to the plaintiff. And to this point he cites 2 *Inst.* 395, above stated. '

On a recovery in personal actions, execution shall be of any land which the party had on the day of the *judgment rendered;* but for chattels, only those which he had the day of the execution sued. *Finch of Law,* 471. If debt be brought at common law on a recognizance, he shall have only judgment of the lands *die judicii redditi* on the original writ; but if by *scire facias* founded on the record, then he shall have execution of the lands which the conusor had on the day of making the recognizance. *Dyer* 306. *a. b.* Execution shall only issue of the lands had *at the time of the judgment rendered.* 6 *Edw.* 3. *fol.* 15. *pl.* 14. *Scire facias.*

*Per Shard;* you shall have execution but of the lands which he had *on the day of the judgment rendered.* 6 *Edw.* 3. *fol.* 17. *pl.* 23. *Scire facias.*

1813.

COLHOUN
v.
SNIDER.

Besides the several authorities which have been already cited, many others may be shewn, restricting the liens of judgments under the *Stat.* of 2 *West.* c. 18.; but I shall refer generally to 2 *Bac. Abr.* 363. 364., *Wood's Inst.* 607 (*edit. of* 1738.), *Cro. Car.* 149., *Cro. Jac.* 451, 452., *Keilw.* 87 *a.*, *F. N. B.* 267. *fol.* 597., 2 *Hen.* 4. 14 *a.*

It is moreover worthy of observation that though *Ld. Ch. Bar. Comyns*, in his 3d *Dig.* 307. (1*st edit.*) tit. *Execution*, *D.* 1., cites the case of 30 *Edw.* 3. 24., in two instances, yet he wholly omits the deductions drawn from it in 1 *Roll. Abr.* 892. *pl.* 16, and confines the liability of the lands to those which the defendant had at the time of the judgment rendered.

The case of the *King* v. *Death*, *Cro. Jac.* 513. *Mich.* 15 *Jac.* in the Exchequer, which was not cited upon the argument, has been put into my hands by a learned friend, who observed that it required an answer. It is short, and runs thus:—" It was found by inquisition that one *York* had reco-"vered in an action upon the case for words against *John* " *Allen*, five hundred pounds. *Afterwards John Allen* and *Ed-*"*ward Allen* purchased land in fee, and aliened it to *John* "*Death*. *York* was outlawed, and so his debt became for-"feited to the king. The question was, whether the king "should have execution of the moiety of the moiety of " *John Allen*, or the entire moiety; and it was resolved, that "he should have the entire moiety, although *York* should " have had but the moiety of the moiety; but the debt com-" ing to the king, he shall by prerogative have execution of " the entire moiety. And it was adjudged accordingly."

This case is supposed to bear upon the question now before the Court, in as much as after stating the recovery, it proceeds to say, that *afterwards* the two *Allens* bought the lands, and aliened them. Of this circumstance no notice whatever is taken by the Court.

It will be found, that this case is incorrectly reported; and that the only particular wherein it may be supposed to be analogous to that under consideration, is stated differently in other books, and even by Sir *George Croke* himself. I have endeavoured to trace it through all its different branches, and will give the full result of my researches.

It first appears in *Cro. Eliz.* 50, under the names of *Allen* v. *York*, 28 and 29 *Eliz. in B. R.*, wherein it is stated

that *York* had recovered 4000*l.* damages against *Allen*, and had died, having been satisfied of 1000*l.* part thereof; and the question raised was, whether his executor could support a *scire facias* for the residue of the judgment. Of this the Court doubted, and no decision is stated to have been given.

It then in the following year in the same book, page 72, assumes the shape of a *scire facias* upon a recognizance by *Mary York* v. *Allen;* when it was resolved, that if a pardon relates back to a day before the exigent was awarded, the outlawry is thereby discharged.

It appears again in the Exchequer, *Pasch.* 36 *Eliz. Saville* 133; and it is there stated that *York* had recovered 5000*l.* damages against *Allen*, that *York* was outlawed, and the queen had granted to *Francis Anger* the profits due on the outlawry; and it was held that the patentee might sue in his own name, or in the name of the queen at his election. Attaint having been brought in *C. B.* of the verdict in *B. R.*, the record was removed into *B. R.*, and there affirmed; and it was resolved that *B. R.* should award execution on the first verdict. *Cro. Eliz.* 371. *Hil.* 37 *Eliz.*

In *Lane* 20. *Pasch.* 4 *Jac.* in the Exchequer, *York* and *Allen* is exhibited with very different features from those disclosed in the report in *Cro. Jac.* 513. It is there said that a man recovered damages in an action upon the case against *B*, who at the *time of the judgment* was jointly seized in fee with *C;* and that *after that, B* and *C* aliened, and the king eight years after the outlawry extended the moiety for the damages recovered against *B.* And the barons were clear in opinion that the king should have it in extent; for it was *liable* to the extent of the party outlawed *before the alienation*, and when it comes to the king by the outlawry, although it be after the alienation, it continueth extendable to the king, although the alienation was before the outlawry.

The reasoning of the Court here, strongly fortifies the sentiment I have adopted. Why should the barons rely on the liability of the lands to the judgment previous to the alienation, if independently thereof, the premises in the hands of a fair purchaser were legally subject to the extent?

The *King* v. *Twine* and *others*, in the Exchequer, *Trin.* 5 *Jac.* *Cro. Jac.* 179., furnishes the fullest detail of the

1813.

COLHOUN
*v.*
SNIDER.

.1813.

COLHOUN
v.
SNIDER.

whole case. It contains the recovery of 4000*l.* damages, the outlawry of *York* in a personal action, the grant to *Anger* by queen *Elizabeth* of ·all his goods, chattels, and debts to the use of *Mary York*, 34 *Regni sui*, and the assignment by *Anger* of that debt and judgment to *Twine*, and then proceeds thus: And notwithstanding, an extent issued in the king's name, to extend all the lands which the said *John Allen* had at the *time of the judgment*, and the lands in the possession of *Twine* (which *he purchased after the judgment*) were extended. The terre-tenant pleaded the assignment made by the queen, and that he was not chargeable to the king. Upon demurrer thereto, it was adjudged, that the king might by his prerogative assign a chose in action, and that the assignee might sue either in his own name or the king's, and that the land should remain in extent for the king. In 2 *Rol. Abr.* 807. *pl.* 7, the same case is shortly mentioned, and ruled that if a recoveror of damages be outlawed in a personal action, the king shall have them, and shall have execution on the judgment. *Mich.* 5 *Jac.* in Exchequer *inter York* and *Allen. Per Cur.*

I have been thus minute, and I fear tedious, in recapitulating all the views wherein this case presents itself in the different books; from being told that it is much relied upon by the advocates opposed to my doctrine. I think it will be found, upon the most careful examination, that the case in *Cro. Jac.* 513, decides no other principle, than what must be admitted upon all hands to be clear law, viz:" that where a subject is outlawed, the king shall seize *all* the land of the conusor or obligor to such outlaw, although a private individual upon a judgment can take only a moiety. The distinction is founded on the prerogative of the crown. 5 *Co.* 56 *a. Plowd.* 243. In no ramification whatever of the case, which I have been able to discover, in any book, has any stress been laid either by the bar or Court, on the doctrine that a judgment *per se* will bind lands, purchased afterwards, though aliened *bonâ fide.* Under this review then of the different authorities, I trust, that without hazarding too confident an opinion, I may venture to assert, that the doctrine contended for by the plaintiff in error, *is* at least highly questionable in the *English* law.

I now proceed to consider the subject upon another ground,

which appears to me more material in our present inquiry, how far that doctrine would be consistent with our munici- pal laws and customs, and conducive to the public weal.

We have two acts of assembly in force, directing the tak- ing of lands in execution for the payment of debts; the first passed in 1700, (1 *Smith's Laws* 7.) the other in 1705, (*Ib.* 57.) which as to the point before the Court pursues the words of the first law. It recites that " to the end that no creditors " may be defrauded of their just debts, due to them from " persons who *have* sufficient real if not personal estates to , " satisfy the same, Be it enacted that all *such* lands, tene- " ments and hereditaments whatsoever, within this province, " when no sufficient personal estate can be found, shall be " liable to be seized and sold upon judgment and execution " obtained." And by the 4th section it is provided, " that " the vendee of the sheriff shall hold and enjoy the lands " sold as fully and amply, and for such estate and estates, " and under such rents and services, as he or they for whose " debt or duty the same shall be sold, might, could, or ought " to do *at or before the taking thereof in execution.*"

It is the obvious meaning of the legislature herein, that the lands directed to be sold, should be *such* lands as the debtor *had* at the time of the judgment, in defect of his per- sonal property. But it is also a reasonable construction, that if the lands to which the debtor was then entitled, should be insufficient to pay the debt and costs, other lands which he might acquire afterwards either by descent or purchase, should be subject to the execution of the creditor; provided that no injury was done thereby to third persons, and that the lands belonged to the debtor at the time of the taking thereof in execution. If after purchased lands should happen to be sold by the debtor, before an execution issued upon the judgment, they would no longer be his property, and would cease to be such lands as were subjected to his exe- cution. No creditor could rely on lands as a fund for the payment of his debt, which did not then belong to his debt- or. In 3 *Black.* 418, 419, before cited, it is said that if the goods are not sufficient to pay the debt, then the moiety of the defendant's freehold lands, which he had at the time of the judgment given, whether held in his own name, *or any other in trust for him*, are also to be delivered to the plain-

VOL. VI.                              T

tiff to hold till the debt be levied: And yet we find in *Hunt* v. *Coles* et al. *Comy. Rep.* 226, that when a trustee had conveyed lands before execution issued, though he was seized for the defendant at the time of the judgment, the lands could not be taken in execution. According to my apprehension, there is a much stronger ground for the exemption of after purchased lands, from the lien of a judgment, under the words and spirit of our law of 1705; for such lands are not the defendant's property, either at the time of the judgment, or the execution sued out.

Our local circumstances differ materially from those of an old settled country, where lands being improved for many years, their prices are not subject to great fluctuation. In *Great Britain* the transfers of lands are comparatively few to what they are amongst us. There through the rights of primogeniture, the instrumentality of strict settlements, and other local causes, real estates continue in ancient families for generations. It is much otherwise here, where lands rapidly rising in price, are treated as a specious of merchandize. Admit for argument's sake the position of the plaintiff's counsel to be correct, as to the law of *England*, where the moiety of the land is held by the creditor until his debt be paid, the land is afterwards restored to the fair purchaser from the defendant; but if that principle was adopted here, the whole estate would pass to the sheriff's vendee, freed and discharged from all claim or pretence of right by such purchaser.

The strong ground however, upon which I rely as to this branch of the case is, the practical construction of our acts of assembly, since they were passed, by the common usage of the country. I have never known or heard it suggested, that upon sales of lands the public offices have been searched for judgments against the purchasers prior to the sale, or against the sellers, except from the time that their title commenced. It is observed in *Sugden* 306, that it is not usual to search for judgments against the vendor, except from the time he purchased the estate: which by the by furnishes proof of the general opinion in *England*, as to the point in question. If the rule should be adopted here, that judgments themselves bind after purchased lands, though transferred *bona fide*, the situation of both seller and buyer is

rendered most highly perilous, under the usual mode of transacting such business. Judgments against the seller antecedent to his acquisition of the property, are let in against the unsuspicious buyer; and as to the seller, he is not rendered secure as to his consideration money, by taking either a mortgage or judgment. The estate must necessarily be for a moment in the buyer before he can execute a valid mortgage, or confess a judgment, which may become a lien on the property bought; but *eo instanti* that the conveyance by the seller is sealed and delivered, the lien of the old judgment against the buyer attaches, as the inevitable consequence of the doctrine contended for. These would be serious evils, and must have been severely felt, if that doctrine had prevailed. No other mode for the security of the vendor presents itself to me, where the old judgments have not been searched for, except a conveyance of the lands subject to the payment of the consideration money, so that the estate *cum onere* should vest in the vendee at the same moment; and yet in the whole course of my experience, I have known or heard only of two instances wherein this precaution has been used. These considerations fully satisfy my mind as to the general understanding of the people upon this subject. General gross negligence and inattention to individual interest, are not the marked characteristics of mankind in a social state.

But the question is not undecided amongst us. In *Rundle* and *Murgatroyd* v. *Etwein*, it was adjudged by a full Court in bank, that mere judgments did not bind after purchased lands, when aliened before execution. I will not say that the point was fully argued, though there were counsel of great ability on both sides; but I have no difficulty in asserting, from the note I took of the case at the time, that *M'Kean* Chief Justice pronounced what was then understood to be the unanimous opinion of the other judges. It has been truly said, that our brothers *Shippen* and *Smith* afterwards expressed doubts upon the *English law*, respecting the liens of such judgments; yet I think I have abundant reason to conclude from copies of *their own papers* now in my possession, that their minds were not changed as to the law and usage of *Pennsylvania* on this point. The inconveniences of a different doctrine struck them

in full force. I wholly omit any remarks on the danger and impolicy of changing a solemn decision, unless the interests of society should imperiously require it. We know that the judgment of the Court of Common Pleas here, was grounded on our former decision.

It remains only, that I should consider a difficulty raised by the plaintiff's counsel, as to holding inquisitions upon lands seized in execution, and the security of sheriffs upon sales. It has been asked how an inquest can possibly ascertain the time when the defendant's title accrued, in order to distinguish between the different judgments binding on his land? I answer, by the public records, if the title is derived under a deed or will; but if by descent, it is as susceptible of proof as any other fact whatever. And as to sheriffs, their conduct may be regulated in the same manner; and it is obvious, that the fewer judgments they have to discharge, there is the less danger as to the misapplication of the money arising upon the sales.

Upon the whole, I am of opinion, that the judgment of *Samuel Colhoun*, the plaintiff in error, did not continue a lien upon the house and lot of *Michael Immel;* and therefore that the judgment of the Court of Common Pleas of *Franklin* county be affirmed.

BRACKENRIDGE J. I understand the question in this case to be, whether a judgment binds lands purchased after the judgment, and aliened before execution. If this was to be taken up *upon principle*, I should find no difficulty; for *ideo consideratum est per curiam quod recuperet*, is the entry of the judgment. This judgment by force of the *Statute Westminster* 2., 13 *Ed*. 1. *c*. 18, charges the land of the debtor, and is in the nature of a general security. The lands are but in the nature of a *pawn* or *pledge* to secure the payment of the debt. 2 *Black. Comm.* 289. In the same manner lands descending to the heir were a pledge for the debt of the ancestor, and where no assets existed it might be levied of them, and they might be sold for the debt; and this was the only case in which the land could be sold, unless upon a recognizance in the case of the king. Can any one be supposed to pledge a thing *of which he has not the property?* It would be an absurdity, and inconsistent with the notion

of a *pledge*. A mortgage is always spoken of under the idea that it is a *specific* security, whereas a judgment is but a *general*. But as under a mortgage one can only be considered as pledging what he specifies, so under a judgment whatever property he has at the time. It is impossible that the judgment can attach to more. It cannot enlarge itself beyond the sum recovered. The execution must pursue the judgment as to the sum. Costs are included in the execution as an appendage of the judgment. Interest is added by the Court under the idea of damages for the detention of the debt after judgment; that is, it is endorsed on the execution writ, but subject on motion to the Court to allow or modify. Can the judgment enlarge itself *as to the subject of it?* It can bind only that for which it was a *security*, or what was *pledged* under it. It is contrary to the nature of a lien, and cannot be done. But lands may be taken in *execution* under a *levari facias* at common law, as to present profits, or under an *elegit* by the statute.—Doubtless, but it is by virtue of the execution, and not of the judgment. This is the ground of all the error. For the books speak of the judgment's binding after purchased lands; but they mean no more than that lands purchased after may be taken in execution under the judgment. It is the same in the case of goods and chattels. If a cloak is pledged to one, or put into his possession, and he obtains judgment under a *fi. fa.*, he may levy not only the cloak in his possession, but the coat which he has not. It does not follow that the coat was pledged, because he can also take this. The precedent of the execution shews, that he may not only take the lands that were the debtor's the day of the judgment, but since. A *scire facias* must for this very reason be to the terre-tenants of the land, at the day of the judgment rendered or afterwards, because the lands are liable to be taken in execution. Yet why a *scire facias* to them, but to give an opportunity of shewing that the debt is satisfied; for by virtue of the statute, these lands are liable to be taken in execution, being the property of the debtor at the time of the *elegit* sued out. But may they not shew, not only that the debtor had not these lands at the day of the judgment, but also that he had them not at the day of suing out the *elegit?* This is the question that we are to examine.

There are authorities that seem to look as if execution could be laid upon lands *bound by the judgment only.* 2 *Inst.* 395. *Et medietatem terræ suæ.* This says the commentator, is to be understood of the one half of such land as the defendant had *at the time of the judgment,* or at the recognizance knowledged, unless it be conveyed away by *fraud* or *covin* to deceive his creditors. This exception under the *unless,* shews that the words respect lands conveyed away before the judgment, and have no relation to lands conveyed away *after.* It proves therefore nothing upon this point, though it may be cited for it. It means that no *fraudulent* conveyance of lands *before judgment* shall bar the lien. *Cro. Car.* 149, is sometimes cited; this means nothing as to this point. It is only that goods are bound by the *execution,* but lands by the *judgment.* But it does not follow that lands are not bound by the execution also, when levied upon them. *Coke Lyttleton* 102 is cited as conclusive; it concludes nothing. It is only that judgment cannot have a *retrospect* to lands aliened *before the judgment.* The diversity proves this, taken between lands *by descent* to the heir, bound *before the judgment* in right of the land. Other judgments are in right of the person, and cannot bind before. I discard these authorities as having no application to the point. But I put it upon the principle, that the *judgment* cannot extend itself, though the *execution* may take more; and it is with a view to this only, and in this sense, that the judgment is said to bind. This is said abundantly in the books. 2 *Cruise on Real Property* 73. " A " judgment binds all the freehold lands whereof the person " against whom it is obtained is seized *at the time;* and no " subsequent act of the debtor, not even an alienation for a " valuable consideration to a purchaser who has no notice of " the judgment, will avoid it. A judgment also binds all the " lands which are afterwards acquired by the debtor." He cites no authority. He is not correct. It is not the judgment that binds after purchased lands, but the execution that may be levied, and this is all that I take it he can mean. If he means more, he will be an authority so far as he goes. It is an hypallage, the effect for the cause. The writ of *elegit* takes, and therefore the judgment is said to bind. But the *elegit* takes by force of the statute the possession of the lands, just as the *levari facias* at common law would have taken the

present profits; and the *levari facias* would not be confined to lands bound by the judgment, but the profits of land not bound might be taken as chattels under a *fieri facias;* but the ownership must be in the debtor. A judgment as against the defendant and his heirs, binds a moiety of all the freehold lands and tenements of which he or any person in trust for him were seized, at or after the time to which the judgment relates. *Tidd* 850. Will it be too much to say that *Tidd* is incorrect in attributing to the lien of the judgment, what was the effect of the execution, or that he means no more? Let him be supposed to mean what he seems to state, and to attribute to the judgment *virtute* lien, what it appears to me the statute 13 *Ed.* 1. *c.* 18, which he cites, by no means warrants. I say let him be supposed to lay it down *totidem verbis*, that after purchased lands, though aliened before execution, are bound by the judgment. It is no more than *Rolle* in his *Abridgment* 892, *totidem verbis*, has already said. " It may be laid (execution) upon any land that he has by purchase since the judgment, although he hath aliened it before execution." This is the bull by the horns, that I take. *What is his authority?* He cites the *Year Book*, 30 *Ed.* 3. The point there was whether having taken an *elegit*, and the sheriff returned *nihil*, a *capias* could afterwards be sued out. It was decided that after the *elegit* taken, he could have no other execution; a decision perfectly erroneous. *Hob.* 57, holds the law to be *clear contrary*, and speaks of this year book and some others, as that " concerning them there was never a judgment but one." Whether after purchased lands aliened before the execution, could be taken by the *elegit*, was not in view; nor is there any thing said from which a colour of inference can be drawn, save a *dictum* of *Finch*. The inference would seem to have been drawn by *Rolle*, even though but a *dictum;* but having the words before me, I could not draw it. I will give the words in the *Norman* law *French*, so that others may judge: " *Si, al* " *tempus del judgement rend, il avera aucune terre, mes que il* " *ay alien puis, home pouvoit aver execution de celle. Et si il* " *purchase terres apres, homme avera execution de celle.*" Which I translate, " if a man at the time of the judgment " rendered, shall have any land, but hath aliened it *since*, he " shall have execution of that; and if he purchases land after,

"he shall have execution of that." It is but an inference from this *dictum*, to say that after purchased lands aliened before execution shall be taken by *elegit;* and whether this inference is just, there is no other evidence but that of *Rolle* having made it; and yet this is the foundation of the whole law upon it. For from *Rolle* it is handed down through all the reports, and 30 *Edw.* 3. is cited, because he cites it. But it may be a just inference, since *Rolle* seems to have thought it so; and if it is a just inference, it will prove that it is not by force of the *elegit*, that after purchased lands are taken, but by virtue of the judgment; a principle I cannot comprehend as grounded upon the analogy of law, that like a scorpion a judgment can expand its claws, and contract so as to fix what it has embraced, that is, bind the pledge originally given it, and open to take more, and shut again. But can it be presumed that *Rolle* would have made this inference, had he not understood this in practice to be an artificial rule of law at the time he wrote, independent of the *dictum* of *Finch;* that understanding it to be the rule of law, he had the more readily refered to the *dictum* as evidence of it, or the more hastily made the inference from the *dictum?* It may have been the law as understood, though contrary to the analogy of pledging; and if so, I would account for it having come to be so understood, from what was done in taking all land under a recognizance to the king, that had been in the debtor at the time or since the taking the recognizance, even though not at the time, but since the recognizance, and aliened before execution. Whether this was so or not, we have no evidence as to what was the law before the *Year Book*, or before the time of *Rolle*, further than these *dicta* support.

But supposing it to be the law, I would resolve it into that all grasping principle, the prerogative of the king. For at the common law, independent of lands coming to the heir by descent, which might be sold for the debts of the ancestor, the recognizance to the king was the only judgment under which lands could be sold. The king having this prerogative, it might be considered but an incident to the prerogative to take after purchased lands, though aliened before execution; and this having become a principle; it was applied in the case of common persons, when by the

statute of *Westminister* 2. they came to have the power to charge lands for debt, and to take execution by the *elegit*.

Another consideration may have led to the having given this extent to the judgment, even by the adjudication of the Courts. Subjecting to debts under the judgment was favourable to alienation; and the greatest extent that could be given to the effect of a judgment, was within the policy. The king was favourable to this, and the judges would seem to have had the same bearing. " A free power of aliena-" tion tended to reduce the power of the nobility, and pro-" portionably to increase that of the crown." 4 *Reeve* 135. " The barring an estate tail, induced the judges to give way " to a subtle finesse of construction, (for such it undoubtedly " was) in order to shorten the duration of those conditional " estates. Courts had so long before as the reign of *Edward* " III., very frequently hinted their opinion that a bar " might be effected upon these principles." 2 *Black. Comm.* 111. For upon the introduction of the feudal tenures into *England*, the feudatory was not only prohibited from alienating his land, but also from charging it with the payment of his debts, because this might tend to disable him from performing his military services. The goods and chattels of the debtor therefore, and the profits of his lands, were the only fund which the law allotted for the payment of his debts. Although this law was well suited to the situation of a warlike nation, yet it was noways for a trading people, where it is a material object to create an extensive credit, which can only be done by making lands and profits subject to the payment of debts; and therefore when about the reign of *Henry* III., the *English* began to acquire some little foreign trade, the inconvenience of this doctrine began to be felt. 2 *Cruise* 59. Hence it is, that the spirit of the people, and the sense of the nation, together with the policy of the crown, could not but give a determination to the jurisprudence of the country. " Alienation of real estate was " always resisted by the feudal lords, but favoured by the " prince and the people. The increase of liberty, and the " growth of commerce, pushed the spirit of unshackling " estates, and the judges also leaned to the unfettering trans-" mission. In the case of the power of devising lands, so " loose was the construction put upon the *stat.* 32 *Hen.* 8.

VOL. VI.                          U

1813.

COLHOUN
v.
SNIDER.

"*ch.* 1., that bare notes in the handwriting of another, were "allowed to be good evidence within the statute." 2 *Black.* 375. With the like leaning it was decided by the judges, that "no after purchased lands will pass under a devise, "unless subsequent to the purchase or contract, the devisor "republishes his will." 2 *Black.* 378. It had been a long struggle on the part of the king, judges. and people, to get lands subjected to debts in any way, and this had been accomplished in part by the *stat. of* 13 *Ed.* 3.; and the more the lands would be subjected, it was in advancement of the policy. This might have led to follow the prerogative, and as in the case of the king, to take all lands before or after, in the case of private creditors. Be this as it may, it would seem to have been the understanding of the law commentators; for *Viner* takes it as *Rolle* has done, and under the head of execution lays it down, 10 *Vin.* 568. *lett. Z. pl.* 16., that " if a man recovers debt, he may sue execution of any "land which he had at the time of the judgment, though he "had aliened it before execution." What is more, under the head of *Lien, vol.* 15, *lett. A. pl.* 1., he cites a case, *Carey* 11, *Crompton* 63, which would appear the strongest of all possible cases. " *A* was bound in a statute to *B,* and one *C* lent "100*l.* to *A*, with which *A* bought lands and assured the " same to *C* for his 100*l. A* failed in payment, *B* extended "that land, *C* was denied help in chancery, although the "land was bought with his money." It would seem therefore to be the law of *England,* whether originating in error, or founded in policy. But we come now to consider it as the law of *Pennsylvania.*

What is there to justify a contrary decision? If in England it has become a rule of property, and estates are holden under it, it cannot there be changed without inconvenience. It may affect those who have taken the after purchased lands aliened before execution; who have taken possession by *elegit.* It may affect creditors, who looking to this principle, may have counted upon the fund of all lands being bound, that at any time come to the debtor after judgment, even though he aliens them before execution. The *elegit,* giving but a temporary possession for the extinguishment of the debt by the issues and profits, cannot affect much. But still it is something as a rule of property, and renders it less easy

to change the rule, than where no such understanding exists, or rule has been known to be established. The reason and policy of the rule also in some degree fail, if there has been any thing in the idea that it was the offspring of a more shackled sale of lands for the payment of debts. If there has been any thing also in the notion, that it received countenance from the example set in the prerogative of the king, it will not be continued in a Commonwealth where kingly prerogative is not favoured. But these are small considerations. I do not know how it is under a recognizance sued, whether after purchased lands aliened before execution are taken; nor is it material. The principal consideration must be that of no impediment existing in *Pennsylvania* to the sale of the whole lands for debt, but that of the law of seven years extent; there is therefore less reason to extend the lien of a judgment. But the tying up by a judgment shackles alienation, which the policy of our law favours, and this may lay a substantial ground of distinction that cannot be disputed in this case. But how will it work in practice, under the law of the seven years extent? Before land can be sold an inquisition must be held. But the inquisition must be held upon the land levied on. All judgments may be shewn to condemn it. What is there in that argument? I can see nothing. The lands levied on are compared with the judgments, and none other. But land after purchased and aliened before execution, may be levied on. It is the very question we make, whether they can or not. But it will behove the creditor to distinguish between after purchased lands, and lands after purchased but sold before execution. On a *scire facias* sued, the terre tenant will shew this, or if levied on under the judgment, the court on motion may set aside the levy. But if not, it is at the risk of the creditor to take such lands, and it is his look out. He can as well ascertain this as what lands were sold before judgment. A conveyance from the debtor, will as well appear upon the books of the register, as a conveyance to him. If a judgment creditor has not such constructive notice from a registry, it may be an answer to the purchaser why the lands may be taken in execution. But the sheriff must look to the lien of every judgment, and on the sale pay over the purchase money according to the priority. What then? I can see nothing in the

supposition that bears upon this point. It is supposing him to be bound to take the distinction between after purchased lands, and lands after purchased but sold before the execution, that he may know what judgments are a lien on this or that land. It is the date he must look at, and the sum. The land that he sells, must be considered bound by judgments prior to the date of that judgment on which he sells. But I deny that he has any thing to do with judgments. He is to sell according to the exigency of his writ, and afterwards pay debt and costs, if the sale comes up to that, if not, what it produces, and the surplus to the debtor, except in the case of a sale under a first judgment, where the surplus may be claimed by a subsequent, and on notice to the she-riff, and application to the Court, it will be so applied. It is the purchaser that is to look to the incumbrances. *Caveat emptor.* It is his affair to examine the lien of every judg-ment, and the amount of debt and costs, and to bid for the premises, what over and above they may be worth. For it is to the land that every prior judgment creditor will look, and is not affected by a sale under a judgment subse-quent to his. Under these considerations it can make no difference whether the rule prevails as it is in *England*, or is changed. But it has been changed in *Pennsylvania* by a de-cision, or rather the decision is an evidence that it never was a rule here. *Rundle* v. *Etwein, December* 1795, banco *Phila-delphia*, it was decided. It was not the only point in the case, but it is reported to have been decided, Chief Justice *M'Kean* on the bench; a great authority. Having therefore an anchor to windward, I am disposed to swing round with it, more especially as the decision best accords with the in-clination of my mind upon principle, as may be collected from what has been suggested. I will acknowledge, that not a single authority, cited for that decision as reported, when it comes to be examined, gives the least countenance to the decision; and there is no argument by the counsel nor rea-sons given by the Court. I must therefore suppose that it must have been upon other grounds than those authorities that the Court went. It must have been upon the equivocal evidence of entry and precedent in the English books, and the obscurity of reports, or *dicta* of writers conflicting with principle, analogy and all reason, or it must have been from

an examination of the *Year Books* from whence all would seem to have sprung, or it must have been from something in the law of *Pennsylvania*, that would not admit of giving such extent to the lien of a judgment here as in *England*. There is one principle which would seem to make a difference. A judgment there is a lien upon estates at law, but not as with us " on every kind of equitable interest in lands, every kind " of right vested in the debtor at the time of the judgment." Chief Justice *Tilghman*. 3 *Binn*. 9. As this makes the lien longer in one way, it would be but reasonable that it should be lopped in another. If it takes all lands in which the debtor has the least *possible interest*, it might be confined to the taking only those where at the time of the judgment or the execution only, he had an interest. I cannot comprehend how they manage matters in *England*, as on *this principle* a case must be supposed sometimes to occur, where a vendee against whom there is a judgment, takes a grant and gives a mortgage in security of payment; it must be that no man can purchase against whom there is a judgment, and give such mortgage, for the judgment must intercept the mortgage and cut it out. There is in the nature of this thing a *punctum temporis*, as in *articulo mortis* where the *jus accrescendi* cuts out the devisee. In the order of time, as in contemplation of law, there must be a priority. The taking the grant in the first instance, and then the conditional regranting, cannot be concurrent acts, or considered such. It is an argument against the extent of this lien in *England*, that we find no case in the books where such difficulty has been raised. Is it because there have been few instances where a person bound by a judgment, has purchased lands and given a mortgage? In *Pennsylvania*, where the settlement of the country has led to so much buying and selling in lands, it would be in the way of this, that the law should be so understood that no one having a judgment against him could purchase lands and give a mortgage, or at least that no one could sell to such, for he could not secure himself by taking the mortgage. The judgment would come in and cut out his security. Whether that case turned upon the law therefore as our Judges may have taken it to be in 1795, in *England*, or whether upon the law as inapplicable to our situation, is not apparent, there having been no argument before the Court on

this point in the manuscript report which I have had the advantage of consulting, and the reasons not appearing upon which the decision went. Nevertheless I am willing to abide by the decision, for I think it right upon principle, and were it even a new case, I should be disposed to decide the same way. For as to all that can be collected from the *English* books, I am not clear that it was originally the *common law*, and much less that it was a principle carried with us in our colonization. That trading in lands, by which they have become almost a species of merchandize like goods and chattels, renders it inapplicable to our circumstances. I think so the more especially, as I feel a repugnance to a principle which would not seem to have had originally a foundation to support it, and would seem from what has been hinted, to have crept in surreptitiously, and been propagated from one reporter to another until it came to be taken for *law*. Supposing it to be the law of *England*, it may not be practicable to eradicate it in that country, it having become a rule of property, and estates having passed under it, even though upon investigation it should be evident that it has got into the system, though it did not originally belong to it; as flies, or other *insects*, which have been embodied when the gum or mineral oil was liquid, and cannot be got out when become hard without breaking the amber. For as the poet sings,

> *Pretty in amber to observe the forms*
> *Of hairs, or straws, or dirt, or grubs, or worms;*
> *The things we know are neither rich nor rare,*
> *But wonder how the devil they got there.*

Judgment affirmed.