## WOODS *v.* MAINS.

The mischief existing at the time of the enactment, and the remedy intended, are to be taken into consideration in construing a statute.

Under the laws of Wisconsin and Iowa, previous to the statute of frauds of 1840, judgments did not operate as liens upon real estate.

The sixth section of " An act to prevent frauds," extended to all valid judgments previously rendered in the supreme and district courts, and gave to every such judgment, *in esse* at the date of its approval, as effectual a lien upon the real estate of the judgment-debtor as subsequent judgments.

could. This section also extends to operative judgments rendered within the limits of Iowa, under the territorial governments of Michigan and Wisconsin.

A judgment not a lien upon after acquired estate.

It is not the province of the court to decide upon the sufficiency of testimony pertaining to the facts in a case; nor to order the jury upon the facts to find for either party. The instruction should be exclusively limited to the law of the case.

## Error, *to Des Moines District Court.*

*Grimes* and *Starr* and *L. D. Stockton,* for the plaintiff in error. The following points and authorities were submitted by Mr. Stockton:

1. Judgment in district court, Des Moines county, (*Dyer* v. *English*) rendered June 19, 1838.

2. Execution issued thereon, and returned, October 6, 1838. Returned November 26. Second execution issued January 28, 1843, and returned.

3. English bought the land of U. S., October 28, 1839.

4. Iowa statute relating to judgment liens, was approved January 16, 1840.

5. English conveyed the land to Mains, April 20, 1840.

6. Sale on execution, May 10, 1845.

Purchaser's title at sheriff's sale relates back to the time of his judgment, so as to cut out intermediate incumbrances. *Conard* v. *Atlantic Insurance Company,* 1 Peters, 443. Purchaser's title at sheriff's sale takes effect from the date of the judgment. *Smith* v. *Allen,* 1 Blackf. 24.

At common law, judgment between subject and subject related back to the first day of the term in which it is recovered, in respect of the lands of the debtor, but not as to his goods and chattels. 3 Blacks. Com. 420, 421.

Judgment lien at common law. At common law, a judgment-creditor could only have satisfaction of the goods and chattels and present profits of lands of his debtor. Lands were exempt on feudal principles. The writ of *elegit,* which subjected one-half the debtor's lands, given by 2 Statute of Westminster (13 Ed. I. c. 18), gave the creditor the possess-

Woods *v.* Mains.

ion of one-half the debtor's lands, which he had at the time of the judgment rendered. 3 Blacks. Com. 419. This statute did not expressly give the lien, but the courts have, in order to protect their own judgments, uniformly construed them to be liens, "from the power to take the lands in execution." The lien grows out of the right to issue the writ of *elegit*, (by which the lands are taken in execution); and is, consequently, inseparably connected with that right. Ch. J. Marshall, in *Scriba* v. *Deanes et al.* 1 Brock. 170; same in *U. S.* v. *Morrison*, 4 Peters, 136. See 4 Ohio Rep. 94, for language of writ of *elegit*.

· At common law, the judgment bound the land from the first day of the term at which it was rendered; 2 Tidd's Prac. 967; and the 16th sec. of the Eng. Stat. of Frauds (29 Charles II. c. 3,) limited the lien as against purchasers *bona fide*, for valuable consideration, to the day the judgment is signed. 2 Saund. 8 I. to 8 K.; Tom. Law Dict. p. 713.

By the laws of Wisconsin and Iowa, under the writ of *fieri facias*, lands may be taken and sold, and the sheriff's deed conveys the complete title to the purchaser. If, at common law, the title of the creditor and purchaser, under the writ of *elegit*, extended back to the date of the judgment, and bound the lands of defendant in the judgment from that date, how much more should the judgment lien and the purchaser's title, under a *fi. fa.*, (after lands were subjected to sale under the latter writ) extend back to the date of the judgment, and bind the lands of the judgment-debtor from that date. Will not the court even, independent of our statute of January 16, 1840, construe its judgments to be liens, under the right to sue out a writ of *fi. fa.*, and sell the whole of (instead of one-half under an *elegit*) debtor's lands? The courts in England, and in this country, have construed judgments to be liens, in consequence of the right to sue out the writ of *elegit*, " and take the lands of defendant in execution," in language of Ch. J. Marshall. There has been no repeal of the common law in this respect in this state, under the laws of Wisconsin or Iowa, nor even while the laws of Michigan were in force here. (The

law of Michigan is not in derogation of the common law, as claimed by defendant, Mich. law, § 2, p. 424). The lien from the date of the judgment still continues, unless expressly taken away by positive enactment. It cannot be reasonably contended, that by the right to seize the whole of the land and sell the fee simple, the lien of the judgment is taken away. If the remedy is extended, the lien is extended and enlarged. So far as the right to enforce the judgment is extended, the lien goes with it.

In none of the New England states are judgments liens. 4 Kent's Com. 434. In some of them, as Massachusetts, land is not taken and sold for payment of debts. *Ib.* 434, Notes. But in the following states they are liens : New York, New Jersey, Delaware, Maryland, Ohio, Indiana, Missouri, Tennessee, South Carolina, Georgia, Alabama, and Louisiana. In Illinois, judgment is a lien by statute. In North Carolina, in a qualified sense by common law. In Virginia, by virtue of the right to sue out the *elegit,* and take the lands in execution. In Kentucky and Mississippi, judgment is a lien only from delivery of execution. 4 Kent's Com. p. 434. This lien is not affected by the failure of the judgment creditor to proceed on his judgment, until a subsequent lien had been obtained and carried into execution. *Rankin* v. *Scott,* 6 Cond. 504, 12 Wheat. 177. The lien of judgments in England was never given by any statute, but, as Chief Justice Marshall says, arose in consequence of the right to take the lands in execution (1 Brock. 170) and sell the same. The *elegit* gave the right to sell one-half the debtor's lands, and take possession of the same. If the *fi. fa.* gave the right to take the whole, it took away no lien previously existing, but enlarged the same.

The judgment binds after purchased lands. 1 Tomlin, Law Dict. p. 713; Sugden Vendors, 340 ; *Stow* v. *Tifft,* 15 John. 464.

*Ridgely* v. *Gartrell,* 3 Har. and McHen. 450 ; *Calhoun* v. *Snyder,* 6 Binney, 138, was overruled by the subsequent case of *Richter* v. *Selin,* 8 Serg. and Rawle, pp. 425, 440.

*Roads* v. *Symmes,* 1 Ohio, p. 142, was governed by the

Woods v. Mains.

statute of Ohio, and has been doubted and limited by the subsequent case of *Stiles* v. *Murphy*, 4 Ohio, p. 92.

In no other states of the union have the courts decided that judgments do not bind after-purchased lands. The courts of the only two states where such decision has been made, when the cases have been reviewed before them, have expressed their dissatisfaction with such decision; but as it had become a rule of action and law of property, they refused to disturb it. In Ohio, the decision is declared to be in virtue of the statutory law. 4 Ohio, p. 93, 95.

As to the construction of the statute of January 16, 1840: if the common law was in force, the judgment was a lien from the first day of the term at which it was rendered, according to the legal fiction that the whole term was but one day. By this statute of Iowa, as by the English statute of Charles II., the lien which existed at common law is restrained to the day on which it is rendered. The statute of Charles II. was not in force, because passed after the time which has been fixed, by general consent, as the date when the English statutes are in force in this country. See 1 Kent's Com. 473.

The 6th section of our statute of frauds has relation to three subjects:

1. What judgments are to be effected? 2. Against whom are they to be liens? 3. In what place are they to be liens?

There can be no obscurity arising as to the proper answer to these questions, when it is considered that the statute is partly in affirmance of and partly to change the common law. So far as this 6th section affirms the common law lien, there can be no question but that it extends back to the date of the judgment; and to give it such a construction is not to give it any retrospective effect to destroy vested rights, because the law was so before. Independent of that, Mains (the defendant's) right to the land did not commence until April 20, 1840; while the plaintiff's rights commenced June 19, 1838, when judgment was rendered; and the law was approved January 16, 1840, and was in force thirty days afterwards.

1. The judgments to be effected are, "Judgments in the

district and supreme courts." Was not Dyer's a judgment in said district court?

2. The judgment is to be a lien " against the real estate of the person or persons against whom such judgment shall be rendered." . The words, "shall be rendered," do not qualify or limit the lien to those judgments to be rendered thereafter, because the words are only intended to apply to " the persons" intended to be affected.

3. The judgment is to be a lien " in ·the county in which such judgments may be rendered." And here, also, the words, " may be rendered," are to qualify and limit only the place where the judgment is to be a lien. At common law, the judgment was not only a lien in the county of Westminster, but in all other counties of England. By this statute the lien is confined to the county in which the judgment is rendered.

The rules of English grammar, if applied to these words, will plainly show that they are not in the future tense, but in the present, and convey the idea of, and apply to judgments . then in being. We do not seek to give the statute a· retrospective effect, because it does not affect any prior right in this case; no right in Mains, the defendant, being shown prior to his deed. All the rights of the plaintiff can be secured, without violating any of the settled rules of construction of statutes. If Mains's deed had been executed before the statute, and the plaintiff had relied on nothing but the right given by it, (the statute), he would be seeking to give the statute a retrospective effect. But the statute must be construed according to the law in force at the time, and by such rule, if the judgment was a lien before by the common law, Mains cannot in any respect complain, if the construction we claim is given it. See 1 Swift's Dig. 11, 12.

Dyer's judgment was before the passage of the statute, and we cannot do otherwise than presume that it was passed with reference to all judgments then existing, and the remedy which the creditor had at the time for carrying them into effect. It has never been decided that the legislative power may not enlarge the remedy ; to do so, is contrary to no rule

established to regulate the construction of statutes; it is in conflict with no constitutional provision. The plaintiff has the right to presume, that when Mains took a deed for the land on the 20th April, 1840, he knew of the act of the legislature, passed January 16, 1840, and of the judgment rendered in favor of *Dyer* v. *English,* in the district court of Des Moines county, on the 19th June, 1838. The statute required these judgments to be entered in alphabetical order in the judgment docket, a public record book, in the clerk's office; and imposed a heavy fine on the clerk if he did not so enter it. We cannot doubt that the 28th section of the practice act of January 25, 1839, re-enacted in the practice act of February 10, 1843, was passed with reference to the fact that judgments were liens at common law, and all purchasers were bound to take notice of them. See Statutes, p. 474, § 27.

As to the last instruction given by the court of its own motion, the plaintiff in error refers the court to sec. 35 of the practice act—Statutes, p. 475. "The district court, in charging the jury, shall only instruct them as to the law of the case." In this case the court took upon itself to adjudicate the whole case—both the law and the facts; and such a course was erroneous, and for such error the judgment should be reversed.

As to *scire facias* to revive judgment, after execution once issued, within a year and a day, see 2 Tidd. 1155; 13 Serg. & Rawle, 148; *Thorpe* v. *Fowler,* 5 Cowen, 446; 2 Paine and Duer's Practice, 286.

As to effect of judgment rendered under the laws of Wisconsin, while this country was part thereof, see Organic Law of Iowa, § 2.

The laws of Wisconsin still continued in force after the separation of Iowa, until altered, modified, or repealed. If these laws continued in force, the judgments obtained under them are still in force, either under the laws of Wisconsin, or other laws enacted in their stead by the law-making authority. The mere change of sovereignty cannot invalidate any rights or privileges previously in force. Such a principle has never before, to our knowledge, been seriously contended for.

But if the judgment was not a lien at common law, and if under our statute it was not made a lien from the rendition of the same, no good and sufficient reason can be alleged why the judgment was not a lien from the time our statute took effect, thirty days from Jan. 16, 1840. Mains's deed bears date, April 20, 1840. Previous to that time he had no right in the land. The taking effect of the lien under the statute would be liable to such objection as is taken by defendant to our first position, that the statute should be strictly construed, and should have no retrospective effect. All the plaintiff's rights are established before Mains's rights commenced. That judgments already rendered in the district court, and judgments thereafter to be rendered, should be placed on the same footing, was certainly within the reason of the statute, and may be reasonably taken to have been within the intention of the legislature. What valid reason can be given why part of the judgments of the district and supreme courts should be liens from a certain date, and all rendered before that date should not be liens? When there is no question as to the legislative power, the legislature may be fairly presumed to have done that which a reasonable interpretation of their language warrants us in concluding they intended to do. Such an interpretation of the act of Jan. 16, 1840, if the one previously contended for by us is decided by the court to be incorrect, would carry the lien of the judgment back to a period prior to the inception of Mains's rights, and prior to his deed of April 18, 1840. This would be sufficient to justify the court in reversing the judgment below, and awarding a new trial.

*D. Rorer*, for the defendant. The judgment under which plaintiff in error claims, was rendered on the 19th of June, 1838, by the district court of the territory of Wisconsin, sitting in Des Moines county, some fifteen days before the act of congress took effect, which created the territory and the district courts of Iowa.

At that time, the only statute law, as to the lien of a judgment, in force here, is to be found in the Michigan code,

Woods *v.* Mains.

p. 423, § 2 : " That all lands and tenements, as well as the goods of the debtor, shall be bound from the time they are seized in execution." This statute virtually repealed the common law on the subject, as also the statute of the British parliament, giving the writ of *elegit*. Therefore, whether the lien of a judgment referred to in the earlier books was given by the statute of *elegit*, that is, arose out of it, as contended by defendant in error, or existed at common law, prior to the passage thereof, as is contended by plaintiff in error, is not material to this case; for by the Michigan statute, the matter is fixed, and the land is only bound from the time the same are seized on execution. This statute of Michigan repealed the remedy by *elegit*; for it provided a new remedy by subjecting the lands to sale under execution. See p. 426, § 8.

This statute of Michigan, then, repealed all laws making judgments a lien on lands, and fixed the lien from the levy; and there was no statute reinstating the judgment lien, until the act of the Iowa general assembly, of the 16th of January, 1840. This statute cannot retrospect in its action. See *Dash* v. *Van Kleek*, 7 John. 477 ; 1 Kent's Com. 450 to 456 ; 3 Call, 268 ; 2 Blackf. 76 ; 2 Cranch, 389.

Moreover, the statute of the 16th of January, 1840, giving the judgment lien, says, judgments of the district courts of Iowa territory, (and not of Wisconsin,) are to be liens, &c. The defendant in error, not denying the power of the Iowa authorities to execute the judgments of Wisconsin, remaining in the borders of Iowa, does nevertheless deny that those judgments were made liens by the act of January 16, 1840, for that statute innovates on the common law, and such statutes are to be construed strictly. See 1 Wash. Va., p. 72, as a leading case on the subject.

Admitting, then, that this lien law is to be construed strictly, and by the very letter of it, reference can only be had to the courts of Iowa.

The first statute of Iowa, subjecting lands to sale for debt, (for they were not so subject at the common law,) was approved January 25, 1839. See Laws of 1839, p. 197, § 1. This

statute gave no lien, nor is there any evidence of any levy under it, or the old Michigan statute above referred to, of the laws in question, prior to Mains's deed, so as to cause said lands to be bound as by the second section of the Michigan statute, p. 424.

Having a right to levy a thing, and thereby binding it to pay a debt, and there being a lien without levy on the thing itself, are different things; The prior right we admit, but deny the latter. The prior right, plaintiff in error did not exercise until the land was deeded, and ceased to be the property of the debtor.

Lastly. Defendant in error claims, that plaintiff below showed no legal right or title by his deeds. They were not, nor had they then been acknowledged and recorded, as is required by our statute. Some of the acknowledgments were made during the trial; the papers show it; and the deeds, or part of them, have been re-recorded since. See *Rev. Stat.* p. 209, § 31. "No such instrument in writing shall be valid, except between the parties thereto, and such as have actual notice thereof."

Now, plaintiff's deeds may be good enough between Wells and himself, but not as against us. That even if Wells took a good title by the sheriff's deed, as assignee of Woods, that title is not in the plaintiff, so as to enable him to oust the defendant.

*H. W. Starr*, for the plaintiff. The sale in this case to Wells, under whom Woods claims, passed a title from a date prior to the deed to Mains's, which is dated April 20, 1849. 3 Ohio, 65 ; 1 Blackf. 22, 24.

At first, in England, judgments could not be collected by sale of lands ; but the statute of West. 2, gave a right to sue out execution against one half of the debtor's lands, (called an elegit,) if the plaintiff chose to do so.

And since that time, the courts in England, and this country, have held that a judgment is a lien on so much of the lands as you can sell by execution. In the language of Justice

Woods *v*. Mains.

Marshall, in 1 Brockenborough, 170. " The courts have inferred a lien from the power to take lands in execution." See also Sugden on Vendors, 340, 488, § 4; 2 Saund. 8 K; 2 Tidd. 967 ; 4 Pet. 124 ; 8 Serg. 440; 4 Ohio, 94 ; 1 *ib*. 143 ; 15 John. 457.

The above authorities show that a judgment, without any statute law to that effect, has ever been held a lien on lands ; and also on after-purchased lands, and against *bona fide* purchasers.    The cases in 1 Ohio, and also in 6 Binney, decided that judgments were not a lien on after-purchased lands ; but in 8 Serg. & R. 460, the court say that the decision in 6 Binney was made on some usages and circumstances peculiar to Pennsylvania. ' And they say, farther, " that the rule that judgments were not a lien on after-purchased lands," was an innovation and not an improvement.    The court in 4 Ohio, 94, at the conclusion of their opinion, admit that the doctrine of 1 Ohio, 143, that a judgment was not a lien on after-purchased lands, was an innovation; but they say it has become a rule of property in Ohio, and they therefore think it wrong to change the rule.

The result, then, of the above authorities is, that judgments bind lands, not because there is any statute making them liens, but because the courts of England have the power to sell lands by execution called *elegit*, and we, of the United States, to sell by *fieri facias ;* and that they bind after-purchased lands, and against *bona fide* purchasers.

English bought the land in controversy from United States, Oct. 28, 1839.    The execution law then in force, was the law of Iowa, of Jan. 25, 1839.    See Iowa Laws, 1838, p. 197.

This law authorized the sale on execution of " the lands, tenements, and hereditaments, and any title or equitable right to lands, whether under a certificate of or from any land-office, or a title bond from any person for a warranty deed, or any right whatever to the possession of lands."

Now, Ch. Justice Marshall says, the lien is inferred from the power to sell lands.    The lien then is coextensive with the power to sell, and therefore, under the above law, attached

upon the fee simple; and that too whether the patent had issued, or there was only a certificate from a land-office.

The judgment of Dyer then, on the 28th of Oct. 1839, became a lien on the land in controversy. The record shows that executions issued on this judgment within a year and day, Oct. 6, 1848; and also Jan. 28, 1843. It is held in 6 Cond. R. 505, that a lien is not lost or destroyed by delaying to execute it.

This judgment of Dyer then, was in full life and force on the day of sale on execution to Wells, and we claim as an incident and consequence of the judgment, the sale relates back to the time when English became the owner of the land in controversy.

The doctrine that the judgment could not be a lien, because it was a judgment of Wisconsin, is too weak and too revolutionary to require an answer. It became by the organic law, and by the general rules of government, a domestic judgment. The change of government did not change the rights of person and property. It was a mere change of sovereignty and government; and Iowa took everything of property and rights which Wisconsin left, as a part of the property and rights of Iowa. It was a mere substitution of new officers in place of those who had left. The judgment was then a judgment of the district courts of Iowa, as much as Wisconsin. Any other rule would deny the power of an Iowa court to carry out and enforce by execution a judgment rendered in the territory of Iowa, while that territory was part of Wisconsin.

But again, suppose we had no lien by the judgment on English's lands in 1839, and that a judgment cannot by virtue of the statute of frauds of Iowa, of Jan. 16, 1840, be a lien on after-purchased lands. Yet does not that law operate on the judgment of Dyer, and make it a lien from the taking effect of that law on the lands in the county which then belonged to English.

The court would not, of course, give such effect to the law, against a *bona fide* purchaser from English, prior to the passage of that law; but as between English and Dyer, can

Woods-v. Mains.

there be any doubt that that judgment became a lien, Jan. 16, 1840, or when the law took effect? Certainly, such is the proper construction of that law, if the court follow the rules of construction, as established by the courts, and laid down in 1 Swift. Dig. 11, 12 ; and the rules of grammar, which show the words " may be" to be in the potential mode, and having no reference to time. The judgment then became a lien by the statute, when it took effect,-(say Feb. 16, 1840.) Mains purchased two months after this, and took subject to the lien. This construction of the statute, then, is not giving it a retrospective effect; but only making it operate *in presenti*, on things as they exist, and without divesting any vested right, or relating back a single day.

But the counsel for Mains have insisted in their brief, though they did not do so in argument, that the deed to Wells, or from Wells to Woods, have not been acknowledged and recorded, so as to have any effect against Mains.

It is answer enough to this, to say that the record does not show that the deed from English and wife to Mains was ever recorded at all ; and therefore he had no pretence of title to set up as against Wells, whose deed was duly recorded. The court below then erred in their refusals, and we submit.

*Opinion by* KINNEY, J. This was an action of right brought by Woods against Mains, to recover the following tracts of lands :—The north-west quarter of the north-west quarter of section thirty-five, the north-east quarter of the north-west quarter of section thirty-five, the north-west quarter of the north-east quarter of section thirty-five, the north-east quarter of the north-east quarter of section thirty-five, and the north-west quarter of the north-west quarter of section thirty-six, in township number seventy-one, north of range four west. Plea denying the right of Woods to recover, and verdict for the defendant.

From the bill of exceptions taken to the instructions given, and refused by the court, it appears that the plaintiff introduced evidence tending to show that the defendant was in pos-

session of the lands in controversy on the day of issuing and service of process; and to show title in plaintiff, gave in evidence a judgment in the district court of Des Moines county, in favor of William T. Dyer, and against Levin N. English, rendered while it was Wisconsin, which was read from the original record book of said court, and rendered on the 19th day of June, 1838; by which it appears that a judgment was rendered in favor of said Dyer, against said English, for the sum of $59 93, besides costs of suit. The plaintiff then introduced in evidence an execution, issued upon said judgment, bearing date the 19th day of March, 1845, together with the levy return and receipt thereon, from which it appears that the sheriff had made, upon a *fi. fa.*, November 26, 1838, the sum of $23 32.

Said execution was levied on the 25th day of March, 1845, upon the east half of the south-west quarter of section twenty-five, the north half of section thirty-five, and the west half of the north-west quarter of section thirty-six, in township seventy-one north, and range five west, as the property of said defendant, Levin N. English. The said lands, so levied upon, were sold on the 10th day of May, 1845, to Purley Dunlap, as the agent of said Woods, the plaintiff; and thereupon said Woods, as attorney for the plaintiff, Dyer, receipted to said sheriff in full for said judgment. The plaintiff also offered in evidence a certificate of the sheriff, made in pursuance of said sale to him as the purchaser, and an assignment of said certificate by him made to one Wells. It also appears from the evidence, as set out in the bill of exceptions, that a sheriff's deed was duly made by the sheriff of Des Moines county to said Wells by virtue of the sale of said land; as also a deed from said Wells to the plaintiff, and to L. D. Stockton, James W. Grimes, and Henry W. Starr; as also a deed from said Stockton, Grimes, and Starr to the plaintiff Woods. The plaintiff then introduced evidence showing that two executions had been issued upon said judgment, one of date October 6, 1838, the other of January 28, 1843. The certificate of the register of the land-office was then read in evidence, from

Woods *v.* Mains.

which it appeared that said English purchased from the United States the land in controversy, on the 28th day of October, 1839.

The defendant then offered in evidence, for the purpose of showing title in him to the land in question, a deed from said English and wife, made and executed on the 20th day of April, 1840, which was duly acknowledged and recorded, and from which it appears that said English conveyed to said defendant, Mains, the land in controversy. The defendant also proved that he had been in possession of the land since 1838; and the case was submitted to the jury, the plaintiff asking the court to give the following instructions:—

1. That the act of Iowa, approved January 16, 1840, making judgments of the supreme and district courts liens on the real estate of defendants in said judgments, operated upon the judgment given in evidence, and made the same a lien at law on all lands in Des Moines county, the title to which was in the name of the defendant, English, on the said 16th day of January, 1840. Which instruction was refused.

2. That the judgment given in evidence was a lien on the lands of English in Des Moines county, prior to and at the date of the deed from English and wife to Mains, offered in evidence by defendant, which bears date the " 20th April, 1840," but which the court refused to give in terms; but gave the same with this qualification: " But not such a lien as would effect the fee simple in Mains."

3. That the sale and sheriff's deed given in evidence relate back to the commencement of the lien, and passed to Wells the real estate of English, sold by the sheriff from that time, unless defendant has shown that the lien was lost or extinguished prior to such sale. Which was refused.

4. That the judgment given in evidence in this case was a lien on all the lands of defendant, English, lying in the county of Des Moines, from the date of the judgment until the judgment was satisfied, or lien removed, or displaced by some future act done or committed, so as to prevent alienation by defendant in the judgment. Which the court refused to give in

19

terms; but gave with the following qualification—but not such a lien as would affect the fee-simple title in a purchase from defendant during such lien.

The court then instructed the jury of their own motion, that the plaintiff in this case has not shown that in law he has any valid subsisting interest in the land described in the declaration, and the jury should therefore find a verdict for defendant.

These refusals to instruct, and instructions given, are assigned for error.

In approaching the various important questions presented by the bill of exceptions, and raised by counsel in this case, we do it with great diffidence. But we have been materially aided in coming to a conclusion satisfactory to a majority of the court, by the great ability with which the important principles applicable to judgment liens, the sale and transfer of real property, and the construction of statutes, have been discussed by the respective counsel.

The instructions of the court, as set out in the bill of exceptions, raise three important questions:

1. The doctrine of liens, and to what extent, at common law, judgments were liens.

2. The construction and effect of the statute of frauds of Iowa of 1840, and its applicability to the judgment against English.

3. Whether a judgment can bind lands purchased and acquired by the judgment-debtor posterior to the rendition of the judgment against him.

It is contended, with great apparent confidence, by the counsel for the defendant in error, that neither at common law nor by our statute, was it enacted at the time of the rendition of the judgment, nor at the time the land was sold on execution, that the judgment was not a lien upon the lands purchased by Mains of English and wife. It is also urged with great ability that the statute of frauds of 1840 could not affect the judgment against English, as the judgment was rendered anterior to the passage of that statute; and to give it such effect would

be not only to make it retrospective in its action, but that it would also thereby become a lien upon lands purchased by the judgment-debtor subsequent to the rendition of the judgment.

At an early day, in England, as has been correctly said by counsel, judgments could not be collected by sale of the lands, as they were exempt upon feudal principles. The statute of West. 2, creating the writ of *elegit*, by which the possession of one half of the land was sold, was enacted; and the courts held that, although the statute did not create a lien, yet from the power of the courts to enforce the collection of its judgments, it was a lien upon so much as was within the scope of the writ to execute and sell.

In the absence of statutory enactments at a later period, both in England and in this country, it has been held that judgments were liens upon lands. 2 Tidd. Pr. 967.

In the language of Chief Justice Marshall, the courts have inferred a lien from the power to take lands on execution. 1 Brock. 170. This doctrine appears to have grown out of the nature and properties of the judgment itself, and the execution to enforce its collection, and its utter imbecility without so essential a quality. This principle seems to have been so universally recognized by the courts in England and this country, that it became ingrafted into, and formed a part of the common law of the land.

Since the statute of frauds of West. 2, creating the writ of *elegit*, and the various acts of parliament since that statute, and the apparent necessity of statutory provisions in this country, most of the states of the Union have passed statutes upon the subject of liens, with provisions peculiar to the statutes of the respective states.

At the time the judgment was rendered against English, the Michigan code was in force: Iowa then forming a part of, and being under the jurisdiction of Wisconsin. By the provisions of that code, all lands and tenements, as well as the goods of the debtor, were bound from the time they were seized in execution. Mich. Code, p. 424, § 2.

Woods *v.* Mains.

Iowa assumed a territorial form of government in July, 1838. On the 25th day of January, 1839, the territorial legislature passed an act subjecting real and personal estate to execution. Laws of 1839, p. 197. This act subjected real and personal estate to be levied and sold upon execution.

In neither the Michigan code nor in this statute, is there any express provision making judgments in the district and supreme courts liens. Judgments then, at common law, under the writ of *elegit*, only being liens inferentially, arising out of the power of the courts to collect them, these statutes did not materially change or alter the common law. But the statute of frauds, of 1840, enlarged the common law by directly making judgments liens.

This statute provides " that judgments in the district and supreme courts of this territory shall have the operation of, and shall be liens upon, the real estate of the person or persons against whom such judgments may be rendered from the day of the rendition thereof, in the county within which such judgments may be rendered."

Does this statute apply to judgments in *esse* at the time it took effect, or relate exclusively to those thereafter to be rendered? If it operates upon then existing judgments, the judgment against English comes within its provisions.

In Swift's Digest the following rules are laid down for the construction of statutes : " The common law is to be regarded, and three things are to be considered—the old law —the mischief—and the remedy : how the old law stood at the time of making the act ; what the mischief was for which the common law did not provide ; and what remedy the statute had provided to cure the mischief." By the aid of these rules, we have but little difficulty in placing a construction upon this statute satisfactory to a majority of the court.

The writ of *elegit* in Engand, and of *fieri facias* in this country, seized the property, but the judgments upon which they issued were only liens, by virtue of the power of the courts to enforce the collection of their judgments.

The Michigan code, and the law of 1839, being silent in

Woods *v.* Mains.

relation to liens, the common law remained undisturbed. What then was the mischief to be remedied? and what was the remedy provided by the statute of 1840?

At the time this statute was passed we had just entered upon our territorial existence. Iowa was assuming a business and commercial importance, commensurate with the great and growing enterprise peculiar to the west.

The government lands were brought into a market, and the people for the first time were becoming the fee-simple owners of the soil. Judgments had been rendered in the district and supreme courts of the territory, at a time when there were not any lands on which they could be liens, the title being in the general government.

These judgments, as against real estate of the judgment debtors, having been obtained when they did not, and could not, possess any title to lands, were in many instances nugatory, and comparatively void. At common law, nor by statute, up to the statute of 1840, they were not liens upon lands purchased by the debtors, after the land came into market, and hence creditors were almost or quite remediless.

Under this peculiar state of things incident to the early history and settlement of Iowa, of which the court will take judicial notice, was the mischief, and therefore the necessity of providing a remedy by which these judgments should become liens.

Irrespective of the mischief intended to be cured by the statute, and the necessity of a remedy for which the old law did not provide, we would not do violence to the language of the statute, by giving it a construction applicable to all judgments unsatisfied at the time it took effect.

Judgments in the district and supreme courts shall be liens upon the real estate of the person or persons against whom such judgments may be rendered, &c. To construe this statute as referring exclusively to judgments *in futuro*, would not only be forced and ungrammatical, but such a construction would defeat the object of the legislature in the remedy intended. If they had so intended it to have operated, it is not

unreasonable to presume that they would have used the words, judgments hereafter rendered in the district court, &c., instead of using language which applies as well to judgments in *esse* at the time, as future judgments.

The judgment against English was in full life and force at the time this statute took effect. English at that time was also owner of the land in controversy. The land was in the county where the judgment was rendered; as such we think the judgment clearly became a lien, by virtue and force of the statute. In adopting this construction, and coming to this conclusion, we nevertheless cannot recognize as sound law, that judgments will bind after-acquired land. (*a*)

This appears to have been a controverted question in England and the United States, and at this day it cannot be said to be well settled. Different and apparently conflicting decisions have arisen in the courts, occasioned, probably, to a great extent, in consequence of the peculiar phraseology of the various statutes.

The case of *Stow* v. *Tift*, 15 John. 457, cited by plaintiff, was a case decided upon the statute of New York; and although a majority of the court appear to encourage the doctrine, that judgments will bind after-acquired land, yet Chief Justice Thompson dissented from the decision. The question before the court was, whether a widow could be endowed of lands when the seizin of the husband was but for an instant, and passed from him *eo instanto* he acquired it. But the case of *Calhoun* v. *Snider*, 6 Bin. 135, and the case of *Roads* v. *Symmes*, 1 Ohio, 142, as also the case of *McDonald* v. *Murphy*, 4 *ib*. 94, all tend to establish the principle, that judgments will not attach to lands acquired after the rendition.

If then, in these older states, where great facilities have been extended to creditors for the collection of their judgments, by statutory provisions, this doctrine has not obtained, we know no good reason for its doing so in this state; and particularly

(*a*) See *Harrington* v. *Sharp, ante* 131; also the dissenting opinion of Judge Hastings in this case.

as the decisions of our supreme courts have not been opposed to it.

Neither is it necessary to impart any such life to the judgment against English, to render it a lien upon the land in controversy.   It is true that he purchased it from the government after the judgment was obtained; but it is equally true that he had not transferred it when the statute took effect, making all judgments at that time liens upon all lands owned in the counties by the debtors, where such judgments were rendered.   Neither is the statute retrospective in its action. It operates on judgments in being at the time of its passage.

At the time this statute took effect English owned the land claimed by plaintiff.   Mains did not purchase until some months after; and he is presumed to have done so with a full knowledge not only of the existence of the judgment, but of the statute.

If the defendant had bought the land prior to the passage of the statute, no construction could have been given it, to have affected him.   In that case, English would have become divested of his title, and therefore the statute could not create a lien, it operating to make judgments liens upon lands of which the debtor was seized at the time of its enactment.

Therefore we think the court erred, by not giving the first instruction contained in the bill of exceptions.

It has been urged to the court, with much force, by the counsel for the defendant in error, that, as the judgment was rendered against English antecedent to our change into a territorial government, the statute could not affect it; that it could only affect such as were rendered in the district and supreme courts of Iowa.   We do not think this position well taken.   Section 15th, of the organic law, enacts, "that all suits, process, proceedings, &c., shall be transferred to the district courts established in Iowa."

If, by the organic law, judgments rendered when Iowa was Wisconsin were transferred to the district courts of Iowa, and thereby became judgments in said courts, we think they

are as much subject to the statute as if originally rendered in the courts of Iowa. That judgments were transferred, we think there cannot be any doubt. With the construction we have placed upon the statute, this objection loses much of its apparent weight.

The instruction given by the court, upon their own motion, we think erroneous.

It was the duty of the court to instruct the jury upon all questions of law; but it was alone the peculiar province of the jury to find a verdict upon the facts, under the instructions of the court upon the law. In this case it appears that there was a large amount of testimony before the jury, pertaining to facts—the execution of documents, and other instruments of writing, which presented questions for the consideration of the jury; and the court went too far in ordering them to find a verdict for the defendant. *Rev. Stat.* p. 475, § 35.

In this country it comports well with the genius and policy of the government to extend great latitude to trials by jury, and an innovation upon that policy ought not to be tolerated by courts of justice.

The other questions raised by the bill of exceptions, and assignment of errors, are substantially disposed of by the decision upon the first instruction.

Judgment is therefore reversed, and a new trial awarded.


*Dissenting opinion by* HASTINGS, C. J.    While I concur with the majority of the court in the main points settled in this case, I find myself arriving at a very different conclusion.

The judgment against English was rendered in the year 1838, a period when there was little of any real estate within the present boundary limits of this state owned in fee by the people who then inhabited it.

The first, and I think the most important question to be settled is, whether the judgment against English attached to, as a lien, after-acquired lands. Under the laws then in force, the plaintiff had a right to his execution against the real and personal estate of the defendant. There was no statute then

Woods *v*. Mains.

in force, that has been brought to our notice, which gave the judgment creditor a lien upon the real estate of the defendant, without execution and levy; and no law giving a judgment the property of binding the estate of the defendant, but the common law, modified by the acts of parliament of Great Britain.

By the common law of England, judgments did not attach on real estate, on account, it is supposed, of the feudal tenures by which all the real estate in England was holden at one time. In proportion as the feudal system gave way to the more enlightened and liberal spirit of the age, creditors, who always had a controlling influence, succeeded in procuring the enactment of the statutes of Westminster, 2—13 Ed. I., which gave the creditors the possession of one moiety of the debtor's lands, which he had at the time of the judgment rendered. Because the parliament had put this power into the hands of the creditors, the court of common law immediately erected thereon judgment liens, under pretence that the doctrine originated from the power to take the lands in execution. The lien is said to grow out of the right to issue the *elegit*. *Scriba* v. *Deans*, 1 Brock. 170.

I can see no reason for such an inference; it appears to be an unauthorized, arbitrary rule, which no court ever should have adopted—a violation, it appears to me, of all correct rules of construction of statutes, adding to an act of parliament, without authority, a power to make judgments bind real estate in the hands of innocent *bona fide* purchasers without notice. By the same arbitrary decisions, the lien is made to retroact, and exist days before the judgment is rendered; and the lien would probably have yet existed, but for the interference of the 16th section of the English Statute of Frauds, 29th Charles II. chap. 3, which provided that such liens as against purchasers, *bona fide*, for valuable consideration, should be limited to the day judgment was signed. Thus did this doctrine originate; and having been impliedly sanctioned by subsequent acts of parliament, and especially the last act mentioned, and having been universally conceded to

exist ever since, and coming with our ancestors to this country, and being engrafted upon our systems of jurisprudence as a part of the common law, it would seem to be rash, if not unwise, to question this right of lien wherever the English common law prevails; or that the right to seize lands of a defendant, on execution, exists either by *elegit* or other final process. If there had been no statute in force regulating writs of execution at the time of the rendition of this judgment, I should agree with the court below in limiting the lien; but there were statutes providing for the sale of defendant's land, imparting to the purchaser the title in fee. The *elegit* did not exist, but a more powerful process was substituted; the lien did not depart with the *elegit*, but was extended with the writ of execution to the title in fee of all the lands of defendant. The same reason which caused the origin of this lien, will extend its power from a moiety of the lands of defendant to the entire real estate liable to execution. The judgment, then, at the day of the rendition thereof, possessed the property of binding all the real estate of English, owned in fee, within the jurisdiction of the court which rendered it.

It is argued by plaintiff in error, with much ability, and apparently supported by high judicial authority, that this judgment bound the estate of English, subsequently acquired, and consequently attached to the premises in controversy. Inasmuch as the plaintiff had his right to execution on lands subsequently acquired, and as the lien originated in the right to issue the *elegit* in the first place, so it is contended it extended to, and attached upon, the right to execution on subsequently acquired estate. If the decisions creating a lien, in the first place, were founded in reason, it would be but reasonable that the lien should be thus extended; but as this decision was arbitrary, and engrafted as law upon an act of parliament under mere pretence of construing the meaning and giving effect to the same, and as some of the American courts have repudiated this doctrine, and as much confusion appears to exist in the English cases as to the right of this· lien, and as there appears to be no sound reason in making

Woods v. Mains.

such extension of the lien in this country, I concur with the majority of the court in the opinion, that judgments do not attach as liens upon the real estate of the defendant, acquired after its rendition.   Sugden, in his treatise on vendors, admits " that it was usual to search for judgments against a vendor only from the time he purchased the estate," Sugden on Vendors, 340.   But he condemns the practice, and refers to cases which Yeats, J. in *Calhoun* v. *Snider*, 6 Bin. 138, says, " will not warrant the doctrine to the extent laid down by that author."

In the case cited, 4 Ohio, 94, the court say, " no adjudged case can be found in the English books, so far as opportunity has been allowed for examination upon the question, whether lands acquired subsequent to the judgment, and conveyed before the execution issues, are liable to inquisition under the *elegit;*" and adds, that the supreme court of Pennsylvania have traced the authority to the year-books, and concludes it is not settled by any of them.

We ought not, then, to gratify the rapacity of judgment creditors, by establishing a lien which has been of doubtful existence in a country in which the most favored debtors in failing circumstances were but prisoners at large.   I believe this question has been several times before the supreme court of the territory, and this lien was by that court unhesitatingly repudiated ; and such has been the fate of this question in the district courts of the territory in which I have practised, from the first organization of these courts.

The cases of *Calhoun* v. *Snider*, 6 Binney 138 ; *Roads* v. *Symmes*, 1 Ohio, 142, have ever been regarded in those courts as settling this question.   Estates have been purchased for years, upon the supposition that the law was clearly settled against such liens, and I presume that the premises in controversy were purchased in confident reliance upon the decisions of the courts.   The statute of 1840 does not retroact upon judgments existing at the time, nor give the judgment creditor any rights which he did not possess at the time of its rendition.   Whatever rights the statute would confer upon the

Woods *v*. Mains.

judgment creditor, would impair the rights of the defendant, which are vested, and upon which he had reposed for years in confident security. Therefore the statute should operate upon, and must be construed thus, to act only on judgments *in futuro*. But it is also contended by the majority of the court, that the statutes created a lien in the judgment creditor, upon all lands owned by the defendant at the date of the passage of the act ; and consequently that such a lien was created in this case.

Much is said about the intention of the legislature in the act of 1840. I understand the legislature to have intended to confine the limits within which judgments should bind lands ; whereas the limits of the lien without a statute were controverted : also to limit the lien to and from the day upon which judgment was rendered ; and also to have the unwritten law printed and published, and to adopt a printed rule for future action. To place such a construction upon this act as is contended for by the majority of this court, will be to give the judgment a power which no judgment can possess, rendered since the passage of that act ; for the reason, that such a construction will make a judgment bind real estate which was acquired by the defendant in the execution, after the rendition of the same, which no judgment possesses the power of doing, rendered since the act of 1840.

I cannot, therefore, agree with the majority in their construction of this act, nor in their conclusion, that the court below erred in charging the jury that the plaintiff in this case has not shown that in law he has any valid, subsisting interest in the land described in his declaration. This was the duty of the court, if the plaintiff depended upon paper titles to recover, and there should be a clear, legal defect in plaintiff's title, apparent to the court, as was evident in this case.

It was not charging upon facts, but it was charging the law to the jury. Although I agree with the majority, that the court below erred in the construction of the doctrine of liens, but inasmuch as I think the plaintiff had no right to recover,

for the reasons above expressed, the errors, if any, were harmless. I am therefore in favor of affirming the judgment of the court below.